UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

JEAN GERMAIN,

    Plaintiff,

v.

CODY GILPIN,
KEITH MARKLE,
NICHOLAS SOLTAS,
WALTER ISER, JR. and
BRADLEY WILT,

    Defendants.

Civil Action No. TDC-18-0846

## MEMORANDUM OPINION

Plaintiff Jean Germain, an inmate at the North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, has filed a Complaint under 42 U.S.C. § 1983 against Defendants Cody Gilpin, Keith Markle, Nicholas Soltas, Walter Iser, Jr., and Bradley Wilt, all of whom are correctional officers at NBCI, alleging excessive force and the failure to provide medical care in violation of the Eighth Amendment to the United States Constitution. Pending before the Court is a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("Motion for Summary Judgment" or "Motion") filed by all Defendants except Wilt, who has yet to be served. Also pending are Germain's Motion for Appointment of Counsel and Motion for a Hearing. Upon consideration of the submitted materials, the Court finds that no hearing is necessary to resolve the Motion, so the Motion for a Hearing will be denied. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion for Summary Judgment will be denied, and Germain's Motion for Appointment Counsel will be granted.

## BACKGROUND

### I. Germain's Allegations

In his Verified Complaint, Germain asserts that on March 4, 2015, at approximately 9:30 a.m., Correctional Officer Nicholas Soltas attempted to serve Germain what is known as a "segregation loaf," an unappetizing form of nutrition given to prisoners in segregation in place of a standard lunch tray in order to incentivize them to compliance. Compl. ¶ 1, ECF No. 1. A segregation loaf, otherwise known as a "special management meal" is used "to provide a nutritionally balanced meal for disruptive inmates who are assigned to disciplinary segregation and who have failed to modify their behavior through other means." Inmate Grievance Office Decision 8, ECF No. 15-1 at 56; *see also* Md. Div. Corr., Exec. Directive No. OPS.110.0018, Special Meal Management Service (2016), http://itcd.dpscs.state.md.us/PIA/ShowFile.aspx?fileID=1474. At the time, Germain had been refusing to be housed with a cellmate.

Germain refused to accept the segregation loaf "in protest," demanded to speak with the Officer-in-Charge of the housing unit, and placed his right hand through the feed slot in his cell door. Inmate Grievance Office Decision Findings of Fact ¶ 2, ECF No. 15-1 at 52. When Soltas grabbed Germain's hand and attempted to handcuff him, Germain resisted. As Soltas and Germain struggled, Correctional Officer Keith Markle arrived and without warning dispensed pepper spray through the feed slot onto Germain's face and upper body. According to Germain, the pepper spray blinded him, caused him to gag, and caused burning sensations on his face and upper body. Germain then removed his hand from the feed slot, and the officers closed it.

Soltas then reopened the slot "at least 5 times within 10 seconds" so both Soltas and Markle could again spray Germain with pepper spray. Compl. ¶ 8. At one point, Germain "ran to the slot to give up" and to block the pepper spray from coming through the feed slot, but Soltas pushed

him out of the way so more pepper spray could be deployed. *Id.* ¶ 9. Germain asserts that an entire large canister and another smaller one were sprayed directly onto him.

According to Germain, he stumbled toward the sink in his cell to wash the pepper spray from his eyes, but Sergeant Walter Iser, Jr. had arrived and ordered the water turned off in his cell. Lt. Bradley Wilt then arrived and gave an order for Germain's cell door to be opened.

Germain asserts that after the door was opened, the officers attacked him and "took him to the ground." *Id.* ¶ 14. Once on the floor, Germain was handcuffed. Although Germain was not resisting, Wilt began twisting his right foot and Soltas used two fingers to choke him.

Germain was then escorted to the medical unit where he was seen by a nurse, William Bilak, for the pepper spray exposure, but Bilak identified no problem requiring treatment. After leaving the medical unit, Germain was escorted to the property room for a strip search. According to Germain, Soltas ripped off his clothes, including his shorts and underwear, and either Soltas or another correctional officer deployed pepper spray from a small canister, aiming it at his "anus and sacs." *Id.* ¶ 20. The officers then put a smock on Germain, escorted him to an isolation cell with no running water, and denied him medical attention or a decontamination shower. Germain asserts that Sgt. Puffenbarger, who is not named as a defendant, denied him an opportunity to provide a written statement about the incident.

Following the March 4, 2015 incident, Germain initiated a hunger strike. As a result, Germain was examined by medical personnel on March 5 and March 6. During those visits, Germain did not assert continuing pain or symptoms from the pepper spray, nor did he report that he had been pepper sprayed in his anal area. On March 7, 2015, however, during a visit with Dr. Colin Ottey, Germain reported that he had been "sexually assaulted" by correctional officers who sprayed pepper spray in his rectal area, and that he had suffered rectal bleeding continuing until

3

that morning. Med. Records 8, Defs.' Mot. Summ. J. Ex. 4, ECF No. 10-6. During an examination that day, Dr. Ottey found no active rectal bleeding and no obvious signs of trauma to Germain's rectal area. Germain was seen again by medical personnel on March 8, 9, and 10 because of his hunger strike but did not report issues relating to pepper spray exposure or the alleged assault. According to records relating to another medical visit on March 11, 2015, one week after the alleged assault, Dr. Mahboob Ashraf noted that Germain was not in distress and "has no complain[ts] except [a] minor bruise [o]n his left index finger." *Id.* at 21, 23–24.

## II. Investigations

### A. Use of Force Investigation

On March 4, 2015, pursuant to Division of Correction Directive 20-3, Lt. Thomas Sawyers of NBCI was assigned to investigate the correctional officers' use of force that day and obtained substantially identical written statements from Soltas, Markle, Iser, Wilt, and Correctional Officer James Vinci. According to Soltas, the encounter began because Germain had voluntarily agreed to move to another cell, and Soltas was attempting to handcuff Germain through the feed slot in advance of that move. When Germain grabbed Soltas's arm with his left hand through the feed slot, Markle came to the cell door to assist Soltas, ordered Germain to let go of Soltas's arm, and deployed pepper spray into the cell. Although Soltas was able to break free, when Germain grabbed his arm again, Soltas deployed pepper spray into the feed slot.

After Germain released his grip and retreated from the feed slot, Soltas and Markle ordered Germain to come to the cell door so he could be handcuffed and taken to the medical unit for treatment for pepper spray exposure. Germain refused to comply and instead covered the window of his cell door. The officers then summoned Lt. Wilt and Sgt. Iser, who attempted to convince Germain to come to the door and allow himself to be handcuffed. When Germain refused, Lt. Wilt

4

ordered the cell door to be opened in order to check on his well-being. According to the officers, Germain then lunged at Markle with a closed fist, Markle blocked the punch and, to subdue Germain, struck him several times on his head and upper torso with a closed fist. The officers then took Germain to the floor with Soltas controlling his head and torso, Wilt controlling his legs, and Markle placing him in handcuffs. Once restrained, Germain was escorted to the medical unit where he was evaluated by Bilak. Germain was then strip-searched and photographed. According to Markle, Germain was offered a decontamination shower and the opportunity to provide a statement, but he refused.

Based on these accounts, Sawyers concluded that same day, on March 4, 2015, that the use of force was "appropriate and consistent with all applicable policies" and the Use of Force Manual. DPSCS Investigator's Summary, Defs.' Mot. Summ. J. Ex. 1 at 9, ECF No. 10-3. Germain was served with a Notice of Infraction and placed on administrative segregation status. With their Motion, Defendants have submitted affidavits reaffirming their statements made during this investigation.

### B. PREA Investigation

After Germain reported the alleged pepper spraying of his rectal area to Dr. Ottey on March 7, 2015, an investigation was conducted by the Intelligence and Investigative Division ("IID") pursuant to the Prison Rape Elimination Act ("PREA"), 42 U.S.C. §§ 15601–15609 (2012). When interviewed on April 2, 2015 as part of this investigation, Germain maintained that during the strip search on March 4, 2015, a correctional officer dispensed pepper spray between his buttocks for approximately five seconds. Although Germain acknowledged that he did not specifically see which officer used the pepper, he was 90 percent sure it was Soltas because he heard Soltas giving commands during the strip search. When asked why he had waited three days to report the

5

incident, Germain stated that he did not feel comfortable reporting the sexual assault to the medical staff he saw in the two days after the incident.

When interviewed on April 2, 2015, Soltas denied dispensing pepper spray between Germain's buttocks. Correctional Officer Cody Gilpin, when interviewed, stated that although he witnessed the strip search, neither Soltas nor any other officer dispensed pepper spray between Germain's buttocks. The IID investigative report states that at approximately 2:00 p.m. on March 7, 2015, Lt. Robert Fritz of NBCI reviewed a security video of a corridor through which Germain was escorted from his cell to the medical unit and back following the first pepper spraying. Germain was escorted in a controlled manner in that he was bent over at the waist. According to Lt. Fritz, although Germain's buttocks were exposed in the video as he returned from the medical unit, there was no orange coloring or dampness on his buttocks that would reveal that pepper spray had been used on his buttocks.

Based on this investigation, the IID investigator found that Germain could not provide "any tangible evidence that supported his allegation," concluded that Germain's charge of a sexual assault was "unsubstantiated," and thus closed the matter. DPSCS IID Report, Defs.' Mot. Summ. J. Ex. 5 at 4, ECF No. 10-7.

### III. Procedural History

According to Germain, he attempted to file an administrative remedy procedure grievance ("ARP") on March 20, 2015, but he never received a receipt for his ARP and thus could not appeal it further. Germain then filed a claim pursuant to Maryland's Tort Claims Act with the State Treasurer and was told to file a complaint with the Inmate Grievance Office ("IGO"). Germain's IGO complaint was dismissed because of the "guilty finding" for assaulting the correctional

officers on March 4, 2015 that was entered against him following the Use of Force Investigation. Compl. ¶ 28.

In his Complaint to this Court, Germain asserts claims of excessive force in violation of the Eighth Amendment against Soltas and Markle for the use of pepper spray against him after they had secured the feed slot, against Soltas and Wilt for choking him and twisting his foot while he was restrained, and against all Defendants for using pepper spray on his rectal area during the strip search. He also asserts Eighth Amendment excessive force claims against all Defendants present who did not intervene to stop the excessive force and for failing to ensure he received proper medical treatment and decontamination following the pepper spraying of his rectal area.

## DISCUSSION

In their Motion, Defendants seek dismissal or summary judgment on all claims. Specifically, Defendants assert that all claims against Defendant Gilpin must be dismissed because no facts were alleged against him; that summary judgment should be granted in their favor because the pepper spray was properly deployed in Germain's cell and its use did constitute excessive force, the video evidence and medical records establish that Germain was not pepper sprayed between his buttocks, and Germain was not denied medical care; and that they are entitled to qualified immunity.

### I. Legal Standards

In their Motion, Defendants seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) or summary judgment pursuant to Rule 56. To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Where Defendants have submitted numerous exhibits with their Motion, the Court may consider such evidence only if it converts the Motion to one seeking summary judgment. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985). To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or an equivalent filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 245 (4th Cir. 2002).

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the motion, the Court views the facts in the light

most favorable to the nonmoving party, "with all justifiable inferences" drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.*

## II. Defendant Gilpin

Defendants argue that all claims against Defendant Gilpin should be dismissed because the Complaint does not specifically assert factual allegations or specific causes of action against him. Although the Complaint alleges generally that "defendants" dispensed pepper spray on Germain's "anus and sacs" and that "defendants" violated his rights by "failing to correct" the misconduct of other defendants and "encouraging the continuation of the misconduct," Compl. ¶¶ 33–34, Germain does not identify any actions by Gilpin or even assert that he was present for any alleged misconduct by other Defendants. Notably, Germain does not refer to Gilpin in his affidavit submitted with his Opposition to the Motion. Under these circumstances, the Court will dismiss the claims against Gilpin without prejudice. *See* Fed. R. Civ. P. 8(a); *Iqbal*, 556 U.S. at 678.

## III. Excessive Force

Because Germain is an inmate alleging excessive force occurring in a prison, his § 1983 claim arises under the Eighth Amendment, which prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This prohibition "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The Eighth Amendment is violated when an inmate is subjected to "unnecessary and

9

wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). To establish an Eighth Amendment violation, an inmate must establish both that (1) the injury or deprivation inflicted was objectively serious enough to constitute a violation; and (2) the prison official subjectively "acted with a sufficiently culpable state of mind." *Williams*, 77 F.3d at 761.

On the objective element, a party asserting an Eighth Amendment excessive force claim must demonstrate that the officer used a "nontrivial" amount of force. *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010) (per curiam). "[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* at 37 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). However, an Eighth Amendment violation can occur even if a correctional officer's action did not cause serious injury. *Id.* at 38 ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The extent to which injuries are modest is accounted for in the award of damages. *See Wilkins*, 559 U.S. at 40.

On the subjective element, an inmate must show that correctional officers applied force "maliciously or sadistically for the very purpose of causing harm" and thus "inflicted unnecessary and wanton pain and suffering," rather than "in a good faith effort to maintain or restore discipline." *Hudson*, 503 U.S. at 6 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). In assessing this element, a court should consider "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any

reasonably perceived threat;" and "(4) any efforts made to temper the severity of a forceful response." *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (quoting *Whitley*, 475 U.S. at 321).

The application of pepper spray may be part of "a good faith effort to maintain or restore discipline," *Hudson*, 503 U.S. at 6, such as to control recalcitrant inmates who repeatedly ignore official commands. *See, e.g., Williams*, 77 F.3d at 759, 763 (finding no Eighth Amendment violation where a correctional officer administered pepper spray after the prisoner asked "Why?" in response to specific commands); *Jackson v. Morgan*, 19 F. App'x 97, 99, 101 (4th Cir. 2001) (upholding the use of pepper spray 12 times when an inmate refused to comply with commands to move from his cell). However, "it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Williams*, 77 F.3d at 763. Courts have found that Eighth Amendment violations can be based on the unjustified use of excessive amounts of pepper spray. *See, e.g., Iko*, 535 F.3d at 238 (holding that a correctional officer violated the Eighth Amendment when he deployed pepper spray into an inmate's cell after the inmate attempted to comply with the correctional officer's order and did not react violently, and the officer failed to remove the inmate's clothes or secure medical care after the incident); *Furnace v. Sullivan*, 705 F.3d 1021, 1029 (9th Cir. 2013) (denying qualified immunity on an Eighth Amendment claim where the correctional officer discharged a can of pepper spray until it was empty and another can was also used); *Lawrence v. Bowersox*, 297 F.3d 727, 732 (8th Cir. 2002) (denying a motion for summary judgment on an excessive force claim where a prisoner's cell was doused in pepper spray using a device similar to a fire extinguisher); *DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001) (denying a motion for summary judgment where the correctional officer had indiscriminately sprayed the prison tier with pepper spray).

Viewing the allegations in the light most favorable to Germain, the Court concludes that Germain has stated a valid Eighth Amendment claim for excessive force relating to the use of pepper spray. Where Germain has acknowledged that he resisted Soltas's grabbing of his arm through the feed slot, the initial use of pepper spray arguably may have been justified, depending on whether Markle gave warnings. According to Germain, however, once he moved away from the cell door and the feed slot was closed, Defendants reopened the feed slot to shoot more pepper spray into his cell until they emptied a can and used part of another, even when he was seeking to give up. They also turned off the water to his cell so that he could not seek relief by rinsing his eyes. Given the amount of pepper spray used, at a time when Germain was no longer presenting a threat to the officers, and the deprivation of water to mitigate the effects of the pepper spray, Germain's account is sufficient to state an Eighth Amendment claim. *See Iko*, 535 F.3d at 238; *Furnace*, 705 F.3d at 1029; *Lawrence*, 297 F.3d at 732.

Moreover, after Germain was taken to the medical unit, he was strip-searched in the property room. At that time, on Soltas's order, a can of pepper spray was placed between his buttocks, and pepper spray was released for approximately five seconds. If true, these allegations state an Eighth Amendment claim because there has been no claim that Germain resisted the strip search, and, in any event, there is no valid penological reason to shoot pepper spray in an inmate's rectal and genital area, an action that would necessarily have been conducted "maliciously or sadistically for the very purpose of causing harm." *See Hudson*, 503 U.S. at 6; *Iko*, 535 F.3d at 238 ; *see also Schwenk v. Hartford*, 204 F.3d 1187, 1196–97 (9th Cir. 2000) (stating that a "sexual assault on an inmate by a guard . . . is deeply offensive to human dignity" and can violate the Eighth Amendment even in the absence of lasting physical injury); *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) ("Because sexual abuse by a corrections officer may constitute serious

harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims.").

Where Defendants cannot succeed on a Motion to Dismiss because Germain has stated a valid Eighth Amendment claim, they primarily seek summary judgment in their favor based on the submitted exhibits and evidence, consisting of their affidavits reaffirming their prior statements to investigators, a surveillance video, and Germain's medical records. Summary judgment is not warranted for two reasons:

First, the Court concludes that Germain must be given the opportunity to obtain discovery necessary to oppose summary judgment. When Defendants first filed the Motion for Summary Judgment, ECF No. 10, Germain filed a Motion for Discovery, ECF No. 12, in which he cited Federal Rule of Civil Procedure 56(d). The Court granted Germain's motion in part to the extent that it required Defendants to provide to Germain copies of exhibits attached to the Motion for Summary Judgment and to arrange for Germain to view the surveillance video. Order 3, ECF No. 13. With his Opposition to the Motion for Summary Judgment, Germain has submitted a Rule 56(d) affidavit in which he asserts that additional discovery is necessary. He seeks any additional video evidence, particularly footage from surveillance cameras covering the property room in which the pepper spraying of his rectal area allegedly occurred; documents reflecting whether Germain was scheduled to be moved to another cell on March 4, 2015, which Soltas asserts was the reason for their encounter; and NBCI's use of force and search policies, which Germain seeks as relevant to Defendants' qualified immunity claim. In his separate Motion for a Hearing, Germain also seeks the video recording of the pepper spraying at his cell, which he states was reviewed by the hearing officer at his disciplinary hearing; and the audio recording of his disciplinary hearing in which, he asserts, a correctional officer admits that the water to Germain's

cell had been ordered turned off. Mot. Hearing 1–2, ECF No. 23. The statement regarding the water would, in Germain's view, contradict Iser's account that the water was never turned off.

Where Germain has stated a viable Eighth Amendment claim, his case turns on the resolution of factual disputes. Here, Germain has requested discovery of evidence which, if available, could shed light on those issues. Certainly, any video recordings of the pepper spraying in Germain's cell and in the property room would be relevant to whether excessive force was used against Germain. Records and audio recordings that address whether Germain was scheduled to be moved and whether the water was turned off, are relevant to the credibility of witnesses, which is a critical issue in this case. Accordingly, the Court finds that summary judgment would be premature without additional discovery. The Motion for Summary Judgment may be denied on this basis alone.

Second, although Defendants have argued that the surveillance video discredits Germain's account and thus establishes that no reasonable jury could find in his favor, the Court disagrees. First, the available surveillance video does not relate to the first alleged pepper spraying, which occurred in Germain's cell. Germain asserts in his verified Complaint and affidavits submitted in opposition to Defendants' Motion that Soltas grabbed his hand in an attempt to handcuff him, that Markle pepper sprayed him without warning, and that even after he pulled his hand back from the feed slot and was no longer in a position to grab Soltas, the officers continued to shoot pepper spray into the cell, using over a full can of pepper spray. He also asserts that at that time, he was attempting to use water to rinse off the pepper spray, but the officers had turned off the water to his cell. Finally, he states that when the officers entered his cell, they attacked him, he was taken down to the ground, and he did not resist. By contrast, Defendants assert that it was Germain who initially grabbed Soltas, that Markle warned Germain before he used the pepper spray, and that

they did not continue to shoot pepper spray into the cell when he no longer posed a threat to them. They claim that they ordered Germain to come to the door to be handcuffed for transport for medical treatment, but he refused to comply. They further claim that when they entered the cell, Germain attempted to punch Markle and had to be subdued. Where the video does not depict any of the events inside or immediately outside Germain's cell, it does not compel a definitive determination of which of these diametrically opposed accounts is correct.

Defendants argue that the video conclusively establishes the falsity of Germain's account of the second pepper spraying, when Germain was allegedly subjected to pepper spraying of his anus and genitals. They argue that because the video does not show any orange substance or other indicia of pepper spray on Germain's buttocks, his account has been conclusively refuted. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In *Scott*, the United States Supreme Court granted summary judgment against the plaintiff where a video recording of a high-speed chase directly contradicted the plaintiff's claim that he posed no threat to other motorists during the chase and thus "utterly discredited his testimony. *Id.* at 379–80; *see also Smith v. Ozmint*, 578 F.3d 246, 254 (4th Cir. 2009) (affirming a grant of summary judgment because although the plaintiff claimed that he had been assaulted by correctional officers and held down in scalding hot water, a video recording rendered his account not a credible). However, where a video recording provides some support for one version of events but does not compel the adoption of that account, summary judgment is not appropriate. *Witt v. W. Va. State Police*, 633 F.3d 272, 276–77(4th Cir 2011). In *Witt*, the United States Court of Appeals for the Fourth Circuit held that where a video of a police encounter was of poor quality, lacked sound,

and failed to capture when the plaintiff sustained the head injury that he asserted was the result of deliberate striking and kicking by law enforcement officers, the court could not grant summary judgment in favor of the officers who contended that the injury was the result of an inadvertent blow with a flashlight. *Id.* at 277.

Here, the surveillance video shows only a portion of the transport of Germain to the medical unit and back to a cell. Although it depicts Germain's exposed buttocks during his return to a cell without any specific sign of pepper spray on his buttocks, it does not "blatantly contradict" Germain's account. *Scott*, 550 U.S. at 380. Beyond the fact that Defendants have not submitted any evidence on what color the pepper spray was or what would be visible if it had been sprayed on Germain, Germain claimed that the pepper spray was deployed between his buttocks and on his genitals, so it is not at all clear that pepper spray would have been visible on the portion of his body seen on the video, nor is it clear that it would have remained visible by the time Germain was seen on the video. Notably, as in *Witt*, the video recording does not depict the key conduct in question: the actual pepper spraying in Germain's cell or the crucial strip search in the property room where the pepper-spraying of Germain's anus and genitals allegedly occurred. *See Witt*, 633 F.3d at 277. To the extent that the video provides some support for Defendants' position, it does not provide a basis to entirely discredit Germain's account and grant summary judgment in their favor.

Defendants further argue that a reasonable jury could not accept Germain's account of the second pepper spraying because he did not report it until three days later, after he had visited with medical personnel for other reasons, and because the medical records do not provide evidence corroborating the attack. Although Germain did not report the alleged assault to medical personnel when he was evaluated on March 5 and March 6 for his hunger strike and instead reported it for

the first time when he met with Dr. Ottey on March 7, three days after the incident, such a delay, in and of itself, is not dispositive. *See Leibelson v. Cook.*, ___ F. App'x ___, No. 18-1202, 2019 WL 856589, at *1, 4 (4th Cir. Feb. 22, 2019) (declining to reverse the district court's finding that the plaintiff had presented sufficient evidence of sexual assault to go to the jury where the plaintiff alleged sexual abuse by a correctional officer, did not report it during contact with medical personnel the day after the incident, but later reported it to psychologists one month later). Likewise, the fact that Dr. Ottey, who examined Germain three days after the incident, did not find evidence of trauma to Germain's genitals and rectal area, though favorable to Defendants, lacks necessary context. No evidence has been submitted establishing what injuries, if any, would necessarily be present and visible at that point in time following such an assault. Indeed, in *Leibelson*, the court found that the plaintiff's account of alleged sexual assault was not "blatantly contradicted by the record, so that no reasonable jury could believe it," even though it was not corroborated by any medical evidence that she had suffered an injury. *Id.* at *3–4; *see also Schwenk*, 204 F.3d at 1196–97 n.6. Thus, the Court concludes that formal discovery and a more fulsome record are necessary to determine whether summary judgment is warranted. *See Glass v. Scribner*, No. 04-05953, 2009 WL 2579657, at *6 (E.D. Cal. Aug. 19, 2009) (denying summary judgment where the plaintiff alleged he was forced to strip off his clothes and run around his cell while pepper spray was aimed at his genitals), *aff'd* 474 F. App'x 659 (9th Cir. 2012). The Motion will therefore be denied.

## IV. Inadequate Medical Care

Germain also alleges a violation of the Eighth Amendment based on the failure to provide medical care and a decontamination shower after he was pepper sprayed in his rectal area. In order to state an Eighth Amendment claim arising from the deprivation of medical care, a plaintiff must

demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106. Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure that the needed care was available. *See Iko*, 535 F.3d at 241.

Objectively, the medical condition at issue must be serious. *See Hudson*, 503 U.S. at 8–9. A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241. As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively 'knows of and disregards an excessive risk to inmate health or safety.'" *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (internal alterations omitted). Moreover, if the requisite subjective knowledge is established, an official may avoid liability if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

There is no dispute that after the pepper spraying in his cell, Germain was escorted to the medical unit and examined by a nurse. Following the alleged pepper spraying of his rectal area,

18

however, Germain was escorted to a cell and not taken to the medical unit. Germain, in fact, saw medical personnel the day after the alleged attack, because he had declared a hunger strike and was seen by medical staff on a daily basis, beginning on March 5, 2015, to monitor his well-being and to address any potential side effects resulting from the hunger strike. The medical records from the visits on March 5 and March 6—the two days immediately following the pepper spraying—reveal that Germain did not request treatment for pepper spray exposure and did not discuss such exposure until his allegation to Dr. Ottey on March 7. Germain does not claim otherwise. Thus, the only arguable denial of medical care was the failure to provide a decontamination shower and to bring Germain to the medical unit immediately following the alleged pepper spraying of his rectal area on March 4.

Although there is a factual dispute whether Germain declined a decontamination shower, Germain has not provided evidence that he requested one or exhibited symptoms establishing that such a shower was medically necessary. Although Germain has claimed that he was bleeding after the second pepper spraying, he has not offered evidence to show that Defendants were aware of the extent of any such injuries, or that he requested a medical examination following the second incident. Nevertheless, because discovery is not yet complete, the Court will not grant summary judgment at this time and will revisit this question once the record is complete.

## V. Qualified Immunity

Defendants assertion of qualified immunity does not provide a basis for dismissal or summary judgment at this time. "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "The 'clearly established' standard also

requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 590. This standard is met by controlling authority or a robust consensus of cases of persuasive authority that places the constitutionality of the officer's conduct beyond debate. *Id.* at 589.

As discussed above, the Fourth Circuit has held that "it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Williams*, 77 F.3d at 763; *see Iko*, 535 F.3d at 238. Thus, it is clearly established that the use of pepper spray as alleged by Germain would be unconstitutional. On the present record, there are genuine issues of material fact whether Defendants used pepper spray in the manner alleged by Germain. Accordingly, qualified immunity is not warranted at this time.

## VI. Motion for Appointment of Counsel

As discussed above, discovery is necessary to provide a full picture of the facts underlying Germain's claim. Because Germain, as a prisoner, is not equipped to conduct discovery on his own, the Court will grant the Motion for Appointment of Counsel.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment, will be DENIED. Germain's Motion for a Hearing will be DENIED, and his Motion for Appointment of Counsel will be GRANTED. A separate Order shall issue.

Date: March 29, 2019

THEODORE D. CHUANG
United States District Judge