IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| JEAN GERMAIN, | * |
| Plaintiff, | * |
| | *    Case No. TJS-18-0846 |
| v. | * |
| KEITH MARKLE, *et al.*, | * |
| Defendants. | * |

\*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

Plaintiff Jean Germain, an inmate at the North Branch Correctional Institution ("NBCI") has filed a complaint under 42 U.S.C. § 1983 against Defendants Keith Markle, Nicholas Soltas, and Walter Iser (collectively, "Defendants"),[1] all of whom are correctional officers at NBCI, alleging excessive force and deliberate indifference to serious medical needs, in violation of the Eighth Amendment to the United States Constitution.[2] Now pending before the Court is the Motion for Summary Judgment ("Motion") (ECF No. 73) filed by the Defendants. Having considered the

---

[1] Germain's complaint is captioned "Motion for an Order Compelling Discovery and Motion to Join Claims." ECF No. 1. This document was originally filed in a previous case (*Germain v. Bishop*, No. TDC-15-1421, ECF No. 75). On March 23, 2018, the Court directed that the document be treated as a complaint and that a new civil case be opened. ECF No. 92 in Case No. TDC-15-1421. This case was opened as a result of that order. In his complaint, Germain also named Cody Gilpin and Bradley Wilt as defendants. Gilpin has already been dismissed from this case. ECF No. 26. Wilt has not been served. ECF No. 25 at 1. The only claims at issue in this Memorandum Opinion are those that Germain has raised against Markle, Soltas, and Iser.

[2] In accordance with 28 U.S.C. § 636(c), all parties have voluntarily consented to have the undersigned conduct all further proceedings in this case, including trial and entry of final judgment, and conduct all post-judgment proceedings, with direct review by the Fourth Circuit Court of Appeals, if an appeal is filed. This case was initially assigned to Judge Chuang. It was later assigned to Judge Day. On February 4, 2020, it was reassigned to me.

submissions of the parties, I find that a hearing is unnecessary. Loc. R. 105.6. For the following reasons, the Motion will be granted in part and denied in part.

I.   **Background**

The Court must view the facts in the light most favorable to Germain, the nonmoving party.[3] *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756 (4th Cir. 2021). In February 2015, Germain refused a cellmate.[4] *Id.* at 9. As a result, and consistent with the policy of the warden of NBCI, Germain was "placed on a loaf." *Id.* This means that Germain was served a "segregation loaf," an unappetizing form of nutrition given to prisoners in segregation in place of a standard meal tray. According to Germain's understanding of the warden's policy, an inmate that refuses a cellmate is given a segregation loaf and "a 30-day grace period in which you can choose your own cell mate." *Id.* In early March 2015, before the "30-day grace period" had expired, Germain was informed that he would be given a cellmate. *Id.* Germain protested, citing his interpretation of the warden's policy that allowed him 30 days to choose his own cellmate. *Id.* Germain was removed from his cell "to see the sergeant." *Id.* When he returned to his cell, Germain saw that he had been given a cellmate. *Id.* Germain refused the cellmate, again citing his understanding of the warden's 30-day policy. *Id.* Germain's new cellmate was removed from the cell. *Id.*

The next day, March 4, 2015, at approximately 9:30 a.m. (lunchtime for inmates at NBCI), Soltas brought Germain a segregation loaf. *Id.* Germain explained to Soltas that "following the

---

[3] The facts set forth here are largely based on the testimony Germain gave during his November 13, 2019, deposition. ECF No. 73-3. This testimony is the most complete account of Germain's version of events. The background regarding Germain's allegations in the Court's March 29, 2019, opinion is incorporated by reference. *Germain v. Gilpin*, No. TDC-18-0846, 2019 WL 1433019 (D. Md. Mar. 29, 2019).
[4] Germain believes that he is "not to be double celled" based on a psychologist's previous determination in connection with allegations that he stabbed his cellmate more than 100 times at a different correctional facility in 1997. *Id.* at 15.

warden's policy," he was not "on a loaf," and he had "been given 30 days period to choose [his] own cell mate." *Id.* Soltas "refused to listen" to Germain, and Germain asked to speak with Soltas's supervisor. *Id.*

Germain put his hands through the food slot in his cell door to prevent Soltas from closing it and insisted to speak with a supervisor. *Id.* at 10. Soltas "tried to forcibly handcuff" him and Germain resisted. *Id.* ("[A]nything I do to resist him handcuffing me, I did."). At some point, while Germain was still resisting Soltas's efforts to handcuff him, Markle arrived at Germain's cell and sprayed Germain with pepper spray in an effort to get Germain to let go of Soltas's arm. *Id.* at 10 ("[H]e still trying to handcuff me, I'm still resisting."); 73-5 at 9. Germain pulled his hands back from the food slot and stepped further back into the cell. *Id.* The pepper spray struck Germain on his whole body, including his face. *Id.* The pepper spray caused Germain's eyes to burn and close shut. *Id.* at 13.

Soltas and Markle continued "trying to get [Germain] out of [his] cell" but Germain refused to come out, insisting to speak with a supervisor. *Id.* at 11. While Germain refused to comply with their orders, Soltas and Markle sprayed Germain with bursts of pepper spray. *Id.* Soltas and Markle attempted to handcuff Germain and remove him from the cell, and Germain continued to defy their orders. *Id.* At some point, Wilt and Iser joined Markle and Soltas outside Germain's cell. *Id.* at 12. They insisted that Germain allow them to put him in handcuffs and come out of his cell, but he refused.[5] *Id.* When Germain tried to use the sink in his cell to wash the pepper spray out of his eyes, the correctional officers turned the water off to his cell. *Id.*; ECF No. 73-6 at 7-9. When the

---

[5] The Defendants submitted evidence that they needed to get Germain out of his cell so that they could perform a wellness check and take him for a medical evaluation. ECF Nos. 73-5 at 20; 73-6 at 9. The Defendants' evidence on this point is uncontroverted.

3

officers opened the cell door, Germain rushed the door and assaulted the officers.[6] ECF No. 73-6 at 9-10. The officers wrestled Germain to the ground and placed him in handcuffs. ECF No. 73-3 at 12. Once Germain was handcuffed, he stopped resisting the officers. *Id.* At that point, Wilt twisted Germain's right foot and Soltas choked Germain with two fingers. *Id.*

The officers took Germain to see a nurse, "[s]ame as they always do" after pepper spraying him. *Id.* at 12-13. The nurse checked Germain's vital signs "and that's it." *Id.* at 13. After leaving the nurse's office, the officers took Germain "to the cage area, in the property room to be strip[] searched." *Id.* They put Germain inside the strip search cage and left the door open, which Germain saw as unusual. *Id.* Typically, Germain explained, the officers put an inmate in the strip search cage, close the door, remove the inmate's handcuffs, and tell the inmate to remove their own clothing. *Id.* This time, with the door to the strip search cage open, Soltas ripped Germain's clothes off of him and punched Germain in his ribs.[7] *Id.* After punching him in the ribs a few times, Soltas "ripped" Germain's shorts and underwear off. *Id.* At that point, one of the officers used a "small can of mace, put it behind [Germain] and maced [him] in [his] private part." *Id.* At the time that Germain was sprayed with pepper spray in the cage, his back was turned to the officers so he could not see which of the officers actually sprayed him. *Id.*

---

[6] The evidence that the Defendants submitted on this point is undisputed. During his deposition, Germain testified that after resisting the officers' multiple orders to allow them to handcuff him and remove him from the cell, he "did nothing" when the officers opened the door and was "wrestled . . . down to the ground" before he could react. ECF No. 73-3 at 12. This evidence does not create a genuine dispute of fact because Germain does not directly address the Defendants' allegation that he continued to resist them and tried to attack them when they opened his cell door. Even so, as the Court will explain below, the Defendants were justified in using force to gain control over Germain in light of Germain's previous assault of Soltas, his refusal to obey instructions, and the officers' need to remove Germain from the cell to perform a wellness check and escort him to a medical provider.

[7] Germain's complaint (ECF No. 1) does not allege that the officers punched him in the ribs while he was in the strip search cage.

4

The correctional officers then dressed Germain in a smock and took him to an isolation cell.[8] *Id.* Germain insisted that he be given a decontamination shower so that he could wash the burning pepper spray off of his body, but the officers did not honor his request. *Id.* at 14. Instead they put him in a cell without running water. *Id.* Germain initiated a hunger strike to protest his treatment. *Id.* For the next several days, beginning on March 5, Germain received daily medical visits in connection with his hunger strike. *Id.* During these visits, Germain did not report that he had been pepper sprayed in his rectal area or that he had been refused a decontamination shower. *Id*. at 14-17. On March 7, during Germain's first visit with Dr. Colin Ottey since the March 4 incident, Germain reported that he had been assaulted by the Defendants. *Id.* at 15. This is the first time Germain reported that the Defendants had assaulted him in the strip search cage.

## II. Discussion

The Defendants argue that they are entitled to summary judgment on all of Germain's claims for four reasons. First, the Defendants argue that they have not violated any clearly established constitutional right and are therefore entitled to qualified immunity for all of the claims. Second, they argue that they are entitled to summary judgment on Germain's excessive force claims because their use of pepper spray against him was warranted in light of his failure to comply with their instructions and because no reasonable jury could find that they sprayed him with pepper spray in the strip search cage. Third, they argue that they are entitled to summary judgment on Germain's claims for deliberate indifference to serious medical needs because no reasonable jury could find that they deliberately deprived him of access to any necessary medical care.

---

[8] At some point, Germain testified, the officers took pictures of him. He is uncertain whether the pictures were taken before or after he was placed in the strip search cage. *Id.* at 14.

### A.     Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252.

The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). A party may not rest upon the mere allegations or denials of its pleading but instead must cite to "particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

### B.     Excessive Force

Because Germain is an inmate alleging excessive force occurring in a prison, his § 1983 claims arise under the Eighth Amendment, which prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This prohibition "protects inmates from inhumane

treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The Eighth Amendment is violated when an inmate is subjected to "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97,104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153,173 (1976)). To establish an Eighth Amendment violation, an inmate must establish both that (1) the injury or deprivation inflicted was objectively serious enough to constitute a violation; and (2) the prison official subjectively "acted with a sufficiently culpable state of mind." *Williams*, 77 F.3d at 761.

On the objective element, a party asserting an Eighth Amendment excessive force claim must demonstrate that the officer used a "nontrivial" amount of force. *Wilkins v. Gaddy*, 559 U.S. 34,39 (2010) (per curiam). "[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* at 37 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). However, an Eighth Amendment violation can occur even if a correctional officer's action did not cause serious injury. *Id.* at 38 ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9. The extent to which injuries are modest is accounted for in the award of damages. *See Wilkins*, 559 U.S. at 40.

On the subjective element, an inmate must show that correctional officers applied force "maliciously or sadistically for the very purpose of causing harm" and thus "inflicted unnecessary and wanton pain and suffering," rather than "in a good faith effort to maintain or restore discipline." *Hudson*, 503 U.S. at 6 (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)). In assessing this element, a court should consider "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any

7

reasonably perceived threat;" and "(4) any efforts made to temper the severity of a forceful response." *Iko*, 535 F.3d at 239 (quoting *Whitley*, 475 U.S. at 321).

The application of pepper spray may be part of "a good faith effort to maintain or restore discipline," *Hudson*, 503 U.S. at 6, such as to control recalcitrant inmates who repeatedly ignore official commands. *See, e.g.*, *Williams*, 77 F.3d at 759, 763 (finding no Eighth Amendment violation where a correctional officer administered pepper spray after the prisoner asked "Why?" in response to specific commands); *Jackson v. Morgan*, 19 F. App'x 97, 99, 101 (4th Cir. 2001) (upholding the use of pepper spray 12 times when an inmate refused to comply with commands to move from his cell). However, "it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Williams*, 77 F.3d at 763; *see Dean v. Jones*, 984 F.3d 295 (4th Cir. 2021). Courts have found that Eighth Amendment violations can be based on the unjustified use of excessive amounts of pepper spray. *See, e.g., Iko*, 535 F.3d at 238 (holding that a correctional officer violated the Eighth Amendment when he deployed pepper spray into an inmate's cell after the inmate attempted to comply with the correctional officer's order and did not react violently, and the officer failed to remove the inmate's clothes or secure medical care after the incident); *Furnace v. Sullivan*, 705 F.3d 1021, 1029 (9th Cir. 2013) (denying qualified immunity on an Eighth Amendment claim where the correctional officer discharged a can of pepper spray until it was empty and another can was also used); *Lawrence v. Bowersox*, 297 F.3d 727, 732 (8th Cir. 2002) (denying a motion for summary judgment on an excessive force claim where a prisoner's cell was doused in pepper spray using a device similar to a fire extinguisher); *DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001) (denying a motion for summary judgment where the correctional officer had indiscriminately sprayed the prison tier with pepper spray).

### 1.     The Initial Encounter

The Defendants are entitled to summary judgment on Germain's excessive force claim regarding their use of pepper spray against him in his cell. There is no dispute that Germain resisted the Defendants' efforts to handcuff him by grabbing Soltas's arm and doing "anything" he could to resist being handcuffed. ECF No. 73-3 at 10. It appears that Germain resisted the Defendants' efforts either because he did not wish to receive a new cellmate or because he did not wish to receive a segregation loaf. In either case, Germain believed that the Defendants were not complying with the warden's policy regarding his situation. Whether Germain's interpretation of the warden's policy was correct or incorrect is not material to the issues before the Court. Germain was required to comply with the Defendants' instructions and he refused to do so. Despite the correctional officers' efforts to bring him into compliance, Germain continued to resist and the Defendants sprayed him with pepper spray in an effort to restore order.

There is no dispute that that Germain resisted the Defendants' efforts to bring him into compliance with their instructions throughout the initial encounter in his cell. Germain grabbed Soltas's arm so that Soltas could not handcuff him and did "anything" he could to resist Soltas. He placed sheets or curtains over his cell windows so that the Defendants could not see into the inside of his cell. ECF No. 73-5 at 10. He refused to come out of his cell and insisted to speak with a supervisor. ECF No. 73-3 at 11. He attempted to wash the pepper spray off of his face and body while he continued to defy the Defendants' instructions. *Id.* The Defendants were justified in their use of pepper spray against him during the time that he was inside his cell as part of "a good faith effort to maintain or restore discipline." *Hudson*, 503 U.S. at 6. Because Germain concedes that he resisted the Defendants throughout the initial encounter and that he refused to comply with their instructions, no reasonable jury could find that the Defendants used more force than was necessary,

that the amount of pepper spray used was disproportional to the need for the force, that Germain's conduct did not necessitate the use of pepper spray, or that the Defendants failed to make sufficient efforts to temper the severity of their response. *See Iko*, 535 F.3d at 239. The same goes for the Defendants' decision to turn off the water to Germain's cell until he was brought into compliance with their instructions. Germain attempted to wash the pepper spray off of his face and body before he had complied with the Defendants' orders. The Defendants were justified in stopping Germain as part of their effort to make him comply with their instructions. For these reasons, the Defendants are entitled to summary judgment on Germain's excessive force claims concerning the use of pepper spray during the initial encounter at his cell. *See Corporal v. Carr*, No. DKC-20-534, 2021 WL 424410, at *4-5 (D. Md. Feb. 5, 2021) (granting summary judgment to defendant correctional officers where evidence showed that plaintiff refused to comply with orders and pepper spray was used to gain his compliance with those orders).

### 2. The Takedown of Germain

Once the Defendants opened Germain's cell door, they were justified in wrestling him to the ground and placing him in handcuffs. Throughout the encounter, Germain had explicitly expressed his intention to defy their instructions. The Defendants' efforts to regain control of Germain through physical force was justified. The Defendants are entitled to summary judgment as to Germain's claims concerning the physical force they used to take him down and place him in handcuffs inside of his cell.

### 3. Force After Germain Was Handcuffed

Germain testified that once he was taken to the ground by the Defendants and placed in handcuffs, he stopped resisting. ECF No. 73-3 at 12. Then, he testified, Wilt twisted Germain's right foot and Soltas put two fingers on Germain's neck and choked him. *Id.* The Defendants

dispute Germain's testimony on this point.  A reasonable jury could credit Germain's testimony that Wilt and Soltas used force against Germain after the need for such force had passed. Because Germain's testimony is in conflict with other evidence in the record, there is a genuine dispute of material fact as to whether unjustified force was used against Germain after he was taken down to the ground and placed in handcuffs. *Dean*, 984 F.3d at 308 (explaining that a court may not make credibility determinations in ruling on a motion for summary judgment). The Defendants are not entitled to summary judgment on Germain's excessive force claims regarding Wilt's alleged twisting of Germain's right foot and Soltas's alleged choking of Germain with two fingers.

### 4. The Strip Search

Germain testified that after he was removed from his cell and taken to see the nurse, the Defendants took him to a cage area to be strip searched. ECF No. 73-3 at 13. Germain testified that the Defendants forcibly removed his clothes, punched him in the ribs "a few times," and sprayed him with a "small can of mace . . . in [his] private part." *Id.* Then, according to Germain, the Defendants removed him from the strip search cage, dressed him in a smock, and returned him to an isolation cell without running water. *Id.* at 13-14. They refused his request for a shower to decontaminate himself from the pepper spray. *Id.* at 14. Germain did not receive a shower until his next scheduled shower, which was between four and six days after the March 4 incident. *Id.* at 14, 16.

The Defendants dispute Germain's allegations regarding the assault in the strip search cage. ECF Nos. 73-4 at 18; 73-5 at 12-13; 73-6 at 10-13. They insist that Germain removed his own clothes while he was in the strip search cage; that they did not assault him in the cage; and that they did not pepper spray him in the cage. They state that they offered Germain a shower but he

refused. ECF No. 73-4 at 15. The Defendants also rely on a surveillance video that documents the happenings after Germain was removed from the strip search cage.

Judge Chuang previously explained why the surveillance video does not completely discredit Germain's allegations:

> Defendants argue that the video conclusively establishes the falsity of Germain's account of the second pepper spraying, when Germain was allegedly subjected to pepper spraying of his anus and genitals. They argue that because the video does not show any orange substance or other indicia of pepper spray on Germain's buttocks, his account has been conclusively refuted. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In *Scott*, the United States Supreme Court granted summary judgment against the plaintiff where a video recording of a high-speed chase directly contradicted the plaintiff's claim that he posed no threat to other motorists during the chase and thus "utterly discredited his testimony." *Id.* at 379-80; *see also Smith v. Ozmint*, 578 F.3d 246, 254 (4th Cir. 2009) (affirming a grant of summary judgment because although the plaintiff claimed that he had been assaulted by correctional officers and held down in scalding hot water, a video recording rendered his account not a credible). However, where a video recording provides some support for one version of events but does not compel the adoption of that account, summary judgment is not appropriate. *Witt v. W. Va. State Police*, 633 F.3d 272, 276-77 (4th Cir. 2011). In *Witt*, the United States Court of Appeals for the Fourth Circuit held that where a video of a police encounter was of poor quality, lacked sound, and failed to capture when the plaintiff sustained the head injury that he asserted was the result of deliberate striking and kicking by law enforcement officers, the court could not grant summary judgment in favor of the officers who contended that the injury was the result of an inadvertent blow with a flashlight. *Id.* at 277.
>
> Here, the surveillance video shows only a portion of the transport of Germain to the medical unit and back to a cell. Although it depicts Germain's exposed buttocks during his return to a cell without any specific sign of pepper spray on his buttocks, it does not "blatantly contradict" Germain's account. *Scott*, 550 U.S. at 380. Beyond the fact that Defendants have not submitted any evidence on what color the pepper spray was or what would be visible if it had been sprayed on Germain, Germain claimed that the pepper spray was deployed between his buttocks and on his genitals, so it is not at all clear that pepper spray would have been visible on the portion of his body seen on the video, nor is it clear that it would have remained visible by the time Germain was seen on the video. Notably, as in *Witt*, the video recording does not depict the key conduct in question: the actual pepper spraying in Germain's cell or the crucial strip search in the property room where the pepper-

spraying of Germain's anus and genitals allegedly occurred. *See Witt*, 633 F.3d at 277. To the extent that the video provides some support for Defendants' position, it does not provide a basis to entirely discredit Germain's account and grant summary judgment in their favor.

*Germain*, 2019 WL 1433019, at *7-8.

Although the Defendants have now submitted evidence that the pepper spray was orange in color, ECF Nos. 73-4 at 23; 73-6 at 11, the rest of what Judge Chuang wrote in the previous opinion still holds true. The video surveillance does not show what happened to Germain in the strip search cage. Germain has presented evidence that the Defendants assaulted him in the cage and then refused his request for a shower. While the Defendants have presented evidence that conflicts and tends to discredit Germain's allegations, the evidence they rely on is not so certain as to allow the Court to take the matter away from a jury. There is a dispute regarding what happened to Germain while he was in the strip search cage. The Court cannot make credibility determinations in ruling on a motion for summary judgment. *See, e.g.*, *Dean*, 984 F.3d at 308. This matter must be resolved by a jury. Accordingly, the Defendants' Motion is denied as to Germain's excessive force claims regarding the alleged assault in the strip search cage and the refusal of the Defendants to provide him with a decontamination shower. *See Wagner v. Warden*, No. ELH-14-791, 2016 WL 7178297, at *12 (D. Md. Dec. 8, 2016) (noting that "the Eighth Amendment may be violated if, following exposure to pepper spray, a prison inmate is not provided with the opportunity to shower or wash off the offending substance, at least when it is safe to do so").

### C. Inadequate Medical Care

Germain also alleges a violation of the Eighth Amendment based on the Defendants' failure to provide medical care and a decontamination shower. In order to state an Eighth Amendment claim arising from the deprivation of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need.

*See Estelle*, 429 U.S. at 106. Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure that the needed care was available. *See Iko*, 535 F.3d at 241.

Objectively, the medical condition at issue must be serious. *See Hudson*, 503 U.S. at 8-9. A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241. As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively 'knows of and disregards an excessive risk to inmate health or safety.'" *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (internal alterations omitted). Moreover, if the requisite subjective knowledge is established, an official may avoid liability if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

Judge Chuang previously explained why Germain's only viable claim for the denial of medical care is limited to the day of March 4, 2015:

> There is no dispute that after the pepper spraying in his cell, Germain was escorted to the medical unit and examined by a nurse. Following the alleged pepper spraying of his rectal area, however, Germain was escorted to a cell and not taken back to the medical unit. Germain, in fact, saw medical personnel the day after the alleged

14

>attack, because he had declared a hunger strike and was seen by medical staff on a daily basis, beginning on March 5, 2015, to monitor his well-being and to address any potential side effects resulting from the hunger strike. The medical records from the visits on March 5 and March 6—the two days immediately following the pepper spraying—reveal that Germain did not request treatment for pepper spray exposure and did not discuss such exposure until his allegation to Dr. Ottey on March 7. Germain does not claim otherwise. Thus, the only arguable denial of medical care was the failure to provide a decontamination shower and to bring Germain to the medical unit immediately following the alleged pepper spraying of his rectal area on March 4.

*Germain*, 2019 WL 1433019, at *9.

There is a factual dispute about whether Germain was denied a decontamination shower. Germain testified that his request for a shower was rejected. The Defendants have submitted evidence that Germain declined a shower. Given this dispute of fact, a reasonable jury could conclude that Germain was denied a decontamination shower, and that by denying him such a shower the Defendants were deliberately indifferent to Germain's serious medical needs. *See Wagner*, 2016 WL 7178297, at *10 (explaining that the "Eighth Amendment can be violated when, after a prisoner is subjected to pepper spray, even for a legitimate reason, officers then withhold appropriate medical attention," such as a decontamination shower).

The same goes for the Defendants' failure to bring Germain to the medical unit immediately following the alleged pepper spraying in the strip search cage on March 4. A reasonable jury could conclude that the Defendants were deliberately indifferent to Germain's serious medical needs by failing to take him to be examined by a medical provider immediately after spraying his rectal area with pepper spray. There is evidence that the Defendants understood they were required to take an inmate to receive medical care immediately after being sprayed with pepper spray. ECF Nos. 73-3 at 18; 73-4 at 15. There is also evidence that Germain suffered a serious medical condition after being sprayed with pepper spray in his rectal area. *See Germain*, 2019 WL 1433019, at *7-8. A reasonable jury could find that the Defendants were subjectively

15

aware of Germain's objective need for medical attention on March 4. *See* ECF Nos. 73-5 at 6 and 73-6 at 5 (explaining that the Defendants were aware of the effects of pepper spray); ECF No. 73-4 at 15 (stating that correctional officers are expected to bring inmates to receive medical care after any use of force). Of course, some of this turns on whether the jury believes that the Defendants pepper sprayed Germain in the strip search cage in the first place. And, as Judge Chuang previously noted, the only arguable denial of medical care was on March 4, as Germain saw medical providers on a daily basis beginning on March 5.

### D. Qualified Immunity

"[O]fficers are entitled to qualified immunity under § 1983 unless (l) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 590. This standard is met by controlling authority or a robust consensus of cases of persuasive authority that places the constitutionality of the officer's conduct beyond debate. *Id.* at 589.

As discussed above, the Fourth Circuit has held that "it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Williams*, 77 F.3d at 763; see *Iko*, 535 F.3d at 238. Thus, it is clearly established that the use of pepper spray as alleged by Germain would be unconstitutional. It is also clearly established that "the Eighth Amendment may be violated if, following exposure to pepper spray, a prison inmate is not provided with the opportunity to shower or wash off the offending substance, at least when it is safe to do so." *Wagner*, 2016 WL 7178297, at *12 (collecting cases).

On the present record, there are genuine issues of material fact whether (1) the Defendants used excessive force against Germain after he had submitted to their instructions while handcuffed in his cell; (2) the Defendants used pepper spray against Germain in the strip search cage (3) the Defendants punched Germain in the ribs in the strip search cage; and (4) the Defendants deprived Germain of access to a decontamination shower and medical care on March 4, 2015. Because material issues of fact are in dispute, the Defendants are not entitled to summary judgment on these claims on the basis of qualified immunity. *See Wagner*, 2016 WL 7178297, at *11-12; *Vathekan v. Prince George's Cty.*, 154 F.3d 173, 180 (4th Cir. 1998) ("[S]ummary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants.")

### III.  Conclusion

For the reasons set forth above, the Defendants' Motion for Summary Judgment (ECF No. 73) is granted in part and denied in part. The Motion is granted as to Germain's claims regarding the Defendants' use of pepper spray against him in his cell. The Motion is also granted to the extent that Germain claims that the Defendants were deliberately indifferent to his serious medical needs on any day other than March 4, 2015. The Motion is denied in all other respects.

Given the ongoing COVID-19 pandemic, the Court intends to wait until its schedule is more predictable before scheduling the trial date in this case. When that times comes, my chambers will contact counsel to schedule a conference call to set a trial date and deadlines for pretrial submissions. If the parties believe that a settlement conference with Judge Simms would be useful, they should contact her chambers.

<u>March 29, 2021</u>  
Date

                    /s/  
Timothy J. Sullivan  
United States Magistrate Judge